IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MICHAEL BEARDEN                                              PLAINTIFF

VS.                          NO. <u>1:05CV00072JLH</u>

DUDLEY LEMON, individually and in his official
 Capacity as the Sheriff of Cleburne County                 DEFENDANT

**<u>PLAINTIFF'S TRIAL BRIEF</u>**

COMES NOW the Plaintiff, Michael Bearden, by and through counsel, Harrill & Sutter, P.L.L.C., who for this Trial, states:

Plaintiff has made the following claims: (1) retaliation for exercise of free speech by stating that it was wrong to nolle prosse DWIs and protesting and refusing to follow the Sheriff's policy in this matter (42 U.S.C. 1983 and ACRA); (2) wrongful discharge in violation of public policy revolving around the same issue (common law); and felony tort, based on threats on his job designed to cause him to alter his testimony or not show up for a hearing.  Plaintiff seeks wage loss pursuant to all claims; compensatory damages pursuant to the first and third claims; and punitive damages against the Sheriff individually on the first and third claims.  Defendant argues that the Quorum Court, not the Sheriff was the final decision-maker based on the grievance process, and thus Plaintiff cannot show intent and is estopped from reversing their upholding of the Sheriff's termination decision.

I.      **First Amendment Retaliation**

In order to make out a First Amendment Retaliation claim, Plaintiff must show that he was terminated, that he engaged in protected speech in the form of opposition to the Sheriff's policy of not prosecuting DWIs and not making DWI arrests, that his termination was motivated by that protected speech, and that he was terminated under color of law.  Eighth Cir. Mod. Civ. Jury Instr. 5.71.  For the County/Sheriff-in-his-official-capacity to be liable, the termination must have been the result of an official policy or a single decision by a policy-maker.

1

### A.    Plaintiff engaged in protected speech

In Sexton v. Martin, 210 F.3d 905 (8th Cir. 2000) the Eighth Circuit held that speech about potentially illegal wiretaps constituted speech on a matter of public concern.   Sheriff Lemon has admitted that DWIs involved a clear, substantial, and immediate danger to the public are a serious matter of great concern to the public. See Pl.'s Aff. St. of Facts, at para. 40-48, 147-48, 156. Mike Bearden spoke out against Lemon's policy of not prosecuting DWI charges and not making DWI arrests repeatedly.  See Pl.'s Aff. St. of Facts, at para. 2, 6-10, 12-19.

### B.    Sheriff Lemon was motivated by Plaintiff's speech in making the decision to terminate Bearden

There are different ways of proving intent.  One is through means of direct evidence. The other is through means of indirect evidence, involving the familiar McDonnell Douglas analysis, using things such as comparators and circumstantial evidence of pretext.  Regardless of the type of proof, Plaintiff has more than enough evidence of retaliatory intent to go to a jury.

In cases involving direct evidence, summary judgment is rarely appropriate.  See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).  Direct evidence is typically thought of as comments indicating an illegal mental state.  For example in Beshears v. Asbill, 930 F.2d 1348, 1353-54 (8th Cir. 1991), a remark by the company president to the effect that older employees have problems adapting to changes and to new policies was sufficient to constitute direct evidence.  However, in Griffith v. the City of Des Moines, 387 F.3d 733 (8th Cir. 2004), the Eighth Circuit has explained that 'direct evidence' is not the converse of 'circumstantial evidence'.  Rather, it is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  Direct evidence refers to the causal strength of the proof, not whether it is circumstantial evidence or a statement such as was made in Beshears.  Thus, in Russell v. City of Kansas City, 414 F.3d 863 (8th Cir. 2005), the Court stated that:

> When two co-workers who are the alleged victims of misconduct deny that misconduct occurred and assert that the plaintiff is herself the victim of discrimination by the employer, that may well be direct evidence of discrimination sufficient to withstand the employer's motion for summary judgment. And if this testimony is not by itself sufficient, it is a powerful showing of the pretext needed to defeat summary judgment under *McDonnell Douglas.*

Id., at 866.

In the event Plaintiff is considered to be preceding under <u>McDonnell Douglas</u> he must establish that Defendant's legitimate, non-discriminatory reason is pretextual. Closeness in time between the protected activity and the negative job action is probative of retaliatory intent.[1] The fact that retaliatory decisions were made by individuals accused of discrimination is evidence of pretext.[2] Closer supervision of employees who have complained about illegal practices is evidence of pretext.[3] Pretext can be shown where an employee is treated more harshly than other employees violating a similar rule.[4] Creating a secret paper trail is evidence of pretext[5], as is failure to use normal procedures is a basis for showing pretext.[6] Shifting explanations are evidence of pretext.[7] Accusations of a drastic decline in performance are considered an indicator of pretext.[8] Courts also more closely scrutinize subjective reasons for adverse job actions, recognizing that subjective criteria for 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.'[9] Falseness of the reasons given.[10] Given the discussions in <u>Griffeth</u> and <u>Russell</u>, sufficient evidence in these areas would arise to the level of constituting direct evidence.

---

[1] <u>See</u> *Womack v. Munson*, 619 F.2d 1292 (8th Cir. 1980), <u>cert.</u> <u>den'd</u> 450 U.S. 979 (1981).
[2] *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998).
[3] <u>See</u> *Hossaini v. Western Missouri Medical Center*, 97 F.3d 1085 (8th Cir. 1996).
[4] <u>See</u> *Long v. Eastfield College*, 88 F.3d 300 (5th Cir. 1996); *Johnson v. Palma*, 931 F.2d 203 (2nd Cir. 1991); and *Wilmington v. J.I. Case Co.*, 793 F.2d 909 (8th Cir. 1986).
[5] *Harris v. Richards Mfg. Co.*, 511 F.Supp. 1193 (W.D. Tenn. 1981), *aff'd in part and rev'd in part on different grounds*, 675 F.2d 811 (6th Cir. 1982).
[6] *Durham Life Ins. Co. v. Evans*, 166 F.3d 139 (3rd Cir. 1999); *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1024 & n.6 (8th Cir. 1998).
[7] *Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir. 1997); *Edwards v. U.S. Postal Service*, 909 F.2d 320 (8th Cir. 1990).
[8] *Morales v. Merit Sys. Protection Bd.*, 932 F.2d 800, 803 (9th Cir. 1991).
[9] *Lyoch v. Anheuser-Busch Cos.*, 139 F.3d 612, 615 (8th Cir. 1998); <u>see</u> <u>also</u> *Widoe v. District No. 111 Otoe County School*, 147 F.3d 726, 730 (8th Cir. 1998).

At the pretext stage, with respect to comparators, the Eighth Circuit has enunciated the

following standard:

> Rodgers must show that she and the employees outside of her protected group
> were similarly situated in all relevant respects. _Wheeler_, 360 F.3d at 858. "To be
> probative evidence of pretext, the misconduct of more leniently disciplined
> employees must be of 'comparable seriousness.' " _Harvey_, 38 F.3d at 972-73
> (quoting _Lanear v. Safeway Grocery_, 843 F.2d 298, 301 (8th Cir.1988)); _see also_
> _Wheeler_, 360 F.3d at 858 (concluding that plaintiff and white employee were not
> similarly situated because their actions "involved differing levels of misconduct").

Rodgers v. U.S. Bank, 417 F.3d 845, 853 (8th Cir. 2005).

Plaintiff's evidence of discriminatory intent is strong enough to be counted as direct

evidence, making summary judgment inappropriate.  See Pl.'s Aff. St. of Facts, at para.1-94,

131-36.  First, Plaintiff has statements from the Defendant which qualify under the more

traditional understanding of direct evidence.  See Pl.'s Aff. St. of  Facts at para. 3-4, 6-9, 12-22,

64-67, and 131-36.  These include: illegal direct orders to nolle pros DWIs on Tharp, Cook, and

Williams; Lemon getting angry with Bearden and saying that Bearden knows he cannot tell him

what he wants done in circumstances where he was attempting to get Bearden not to charge

Davies with DWI; and most importantly, Lemon's admission that complaints by Bearden about

the DWI policy were a reason for his termination.  It should be noted that Lemon lied to the

committee about this.  Lemon talks about lots of complaints being made about Bearden, but the

only ones he recalls were about DWIs.  See Pl.'s Aff. St. of Facts, at para. 39.

Plaintiff can provide evidence in the form of shifting explanations.  The letter states

Bearden was terminated for too many traffic tickets and too much time in Heber and at EZ Mart.

As matters progressed, it became traffic stops, not tickets, and not the number of tickets, but the

number of complaints, Bearden's complaints about the DWI policy, speeding, and taking parts

off of a car.  See Pl.'s Aff. St. of Facts, at para. 36, 52-53, 64-67, 70-72; Def.'s St. of

Indisputable Facts, at para. 23-27.  Defendant simultaneously claims most of the time Bearden

was a good officer and lists his promotions (Def.'s St. of Ind. Facts, at para. 10-22), and claims

---

[10] Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1023-24 (8th Cir. 1998).

that Bearden had problems early on.  Id., at para. 34.  Plaintiff is supposedly spending lots of time at EZ Mart, yet he is fired for writing too many tickets.  In December 2004, Lemon claims the last meeting he had with Bearden was in September 2004, and when Bearden presents substantial evidence that he complied with Lemon's orders after September 2004, Lemon attempts to change the meeting date to May 2004.  See Pl.'s Aff. St. of Facts, at para. 49, 76; Ex. B, Lemon, at 14-17.

Plaintiff can provide evidence in the form of false reasons.  Lemon has claimed that there were lots of complaints about Bearden for rudeness, EZ Mart, time in Heber Springs, and too many traffic stops, from civilians and other officers.  But Lemon cannot recall anyone who complained about an action other than a DWI ticket.  He did not document the complaints. There were no more complaints about Bearden than other officers.  The Heber Springs officers came and testified that Bearden was professional, respected, and his help was appreciated, and that he did not spend too much time in EZ Mart or Heber.   Someone Bearden had arrested testified in his favor.   The people at EZ Mart denied he was there very much.   And, finally Bearden's statistics on ticket writing and time at EZ Mart went way down and Lemon knew this. See Pl.'s Aff. St. of Facts, at  para.  37-39, 50-51, 58-63, 74-76, 78-79, 81-84, 87-92;

Plaintiff can also show that he was treated worse than other officers, including Murphy and Schaumleffel.  Other officers wrote nearly as many tickets as Bearden, or more, and  had higher percentages of traffic citations but they were not punished.  This especially true after the September meeting when Bearden drastically reduced the time spent in Heber, at EZ Mart, and the number of traffic tickets he wrote.  When asked about the difference in treatment, Lemon said it was because the other officers did not get as many complaints as Bearden.  Yet Bearden got no more complaints than other officers and was noted for his professionalism.  Bearden also established that he went to EZ Mart on his breaks, did not spend excessive time there, and after September, reduced that amount further.   Lemon takes terminations seriously and therefore tries to get all  the  facts  before  making  that  decision,  and  was  aware  that  there  were  no

complaints about Bearden at EZ Mart after September and that tickets decreased.  See Pl.'s Aff. St. of Facts, at para. 37-39, 50-51, 59-63, 68-76, 78, 82-92.

As in <u>Russell</u>, it has been opined by those with contact with the situation that Bearden's termination was political.  See Pl.'s Aff. St. of Facts, at para. 93.

Also, it is exceedingly suspicious that all of these supposed complaints are undocumented and no individuals can be identified except those complaining about DWIs.  The Court's have found subjective reasons for termination to be suspicious as they are easily manufactured.  Defendant's argument about these complaints, if they were ever made at all, is that even though Bearden has proven them to be false, they are still a valid basis for terminating him because "perception is reality."  This is the essence of subjectivity.  Given Bearden's proof of the falsity of any such complaints, these complaints become even more suspicious, as it is the easiest thing in the world for the Sheriff to say lots of people complained, but there is no documentation and I cannot recall names.

### C.    Plaintiff was discharged

For the reasons stated in Plaintiff's Motion for Partial Summary Judgment, Plaintiff was fired by Sheriff Lemon and not by the Cleburne County Grievance Committee.  See also Pl.'s Aff. St. of Facts, at para. 36, 95-130.  Lemon has admitted this.  Id., at para. 126-27.

## II.    Wrongful Discharge in Violation of Public Policy

It has long been established that where an employee is terminated because he opposed, reported, or refused to participate in his employer's criminal conduct, Arkansas public policy is violated, and the employee will have a cause of action for breach of contract.  <u>Sterling Drug v. Oxford</u>, 743 S.W.2d 380 (Ark. 1988).  Plaintiff must show that three things occurred.  One, that he opposed or refused to engage in an illegal activity.  Two that he was fired.  And, three, that he was fired for his protected activity.  With respect to the second and third issues, Plaintiff has already demonstrated illegal intent and termination in Section I(B)-(C) above.  Issues of estoppel, waiver, and the girievance committee have already been argued above as well.  With respect  to the first

issue, Plaintiff showed that opposed and refused to nolle pros DWIs or not make DWI arrests in Section I(A) above. See Pl.'s Aff. St. of Facts, at para. 1-36. Thus, the only issue remaining is whether or not Bearden's refusal and opposition to nolle prossing DWIs and not making DWI arrests constituted opposition to or a refusal to engage in an illegal activity. The facts and law show that this is the case. See Pl.'s Aff. St. of Facts, at para. 40-48, 143-165; Pl.'s Resp. to Def.'s St. of Indisputable Facts at 213-16, 223-25, 233, 237-39, 350, 352-55, 375, 379-381 (especially 380-81 which states that a person is intoxicated if impaired due to consumption of alcohol or drugs and if they are DWI an arrest should be done).

Arkansas law with regard to the dismissal, nolle prossing, plea bargaining of DWIs is this: "Persons **arrested violating § 5-65-103** shall be tried on those charges or plead to such charges, and no such charges shall be reduced." Ark. Code Ann. 5-65-107(a). "It is unlawful and punishable as provided in this act for any person who is intoxicated to operate or be in actual physical control of a motor vehicle." Ark. Code Ann. 5-65-103(a). Legal intoxication is defined in two ways. First, exceeding a .08 blood alcohol content. Ark. Code Ann. 5-65-103(b). Second, intoxicated is defined as:

> influenced or affected by the ingestion of alcohol, a controlled substance, any intoxicant, or any combination thereof, to such a degree that the driver's reactions, motor skills, and judgment are substantially altered and the driver, therefore, constitutes a clear and substantial danger of physical injury or death to himself and other motorists or pedestrians.

Ark. Code Ann. 5-65-102(1). Not only is this the law, but Defendants are in agreement that an intoxicated person does present a clear and substantial danger to an identifiable group of persons, including the intoxicated person, other drivers, and pedestrians, for a short and identifiable period of time and area.

Defendants are in agreement that a motorist can be stopped based upon reasonable suspicion of having committed a crime for 15 minutes during the time reasonably necessary to perform an investigation. After that point, they can only be detained if they are arrested based on probably cause of having committed a crime. Therefore, the only way that a person who is

DWI can be stopped from continuing to drive (and thus presenting a clear and substantial danger to an identifiable group of persons) is by arresting them.

There are two things that Mike Bearden did that got him terminated. One is that after he had arrested an individual for DWI, he at first protested and resisted, and later outright refused to nolle pros or otherwise sabotage those charges. Second, Bearden refused to stop making DWI arrests when he encountered an intoxicated person who was driving. Terminating him for either reason was illegal.

With respect to protesting, resisting, and refusing orders to nolle pross, dismiss, or sabotage a DWI charge that had been made, it is clear that any DWI charge that has been made must be tried or pled guilty to. The statute states that persons arrested violating the statute **shall** be tried on or plead guilty to them. Ark. Code Ann. 5-65-107(a) (emphasis added).

With respect to refusing to stop making DWI arrests when he encountered an intoxicated driver, the statute states that "Persons **arrested violating** § **5-65-103** shall be tried on those charges or plead to such charges, and no such charges shall be reduced." Ark. Code Ann. 5-65-107(a) (emphasis added). If Bearden arrested an intoxicated driver, he was required to charge them as such. The statute does not say "Persons **charged with violating** § **5-65-103** shall be tried on those charges or plead to such charges, and no such charges shall be reduced." If it did, Bearden might have had the discretion to do a lesser charge, such as public intoxication or reckless driving. According to the statute, if a person is arrested violating the DWI law – if they are arrested when they are both driving and intoxicated - they must be tried on or plead to that charge. Defendant is in agreement with this – see Def.'s St. of Indisputable Facts, at para. 380-81.

It is the public policy of Arkansas to stop people from driving while intoxicated by making sure it is a serious crime that results in the revocation of driving privileges and that is prosecuted. The only other option Bearden would have had would be to not arrest the driver

and let them continue to drive.  Pursuant to <u>Shepherd v. Washington County</u>, 331 Ark. 480, 962

S.W.2d 779 (1998), this also would be illegal.

    In <u>Shepherd</u> a Washington County deputy transported a known violent inmate to a

private medical clinic for treatment.  The inmate disarmed the deputy, killed him, and then

injured an employee of the clinic and killed her spouse.  <u>Id.</u>, 331 Ark. at 486.  The Arkansas

Supreme Court conducted an exhaustive review of the facts and relevant case law in

determining whether or not the Sheriff owed a duty to the Shepherds.  The Court noted that

there had been no duty on the part of a parole beard which made a decision to parole a prisoner

to a girl who was raped by him five months later, because the death was too remote a

consequence.  <u>*Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)</u>.  The

Arkansas Supreme Court noted a finding of a duty in <u>*Nishiyama v. Dickson County, Tenn.*, 814</u>

<u>F.2d 277 (6th Cir.1987)</u>.  In <u>Nishiyama</u>, an inmate had been authorized to use and have control

over a patrol car, and then used it to pull over and murder a young woman.  The Arkansas

Supreme Court quoted the following provision:

> Here the radius of harm is more distinct. When Fiser and Wall allowed Hartman
> to drive unescorted between the jail and Fiser's farm, persons in the vicinity were
> at risk, particularly motorists who out of respect for and fear of law enforcement
> vehicles respond to blue flashing lights. The identification of potential victims
> became even easier once the sheriff's department was notified that its patrol car
> was stopping motorists in Montgomery County. The defendants should have
> known that Hartman was stopping unwitting motorists under the aura of law
> enforcement represented by the patrol car and that, as a result, drivers like Kathy
> Nishiyama in Montgomery and surrounding counties were in jeopardy.

<u>Shepherd</u>, 331 Ark. at 494 (quoting <u>Nishiyama</u>, 814 F.2d at 280).  The Arkansas Supreme Court

then noted that:

> the death of Nishiyama was not so remote a consequence of the appellees'
> actions, through their established practice of entrusting the patrol car to Hartman.
> As opposed to those cases in which the state officers merely possessed
> information that circumstances endangering the public existed, the state actors
> here took the further step of facilitating the crime with their actions "by providing
> the criminal with the necessary means and the specific opportunity to commit his
> crime."

<u>Id.</u>, 331 Ark. at 495 (citing <u>Nishiyama</u>, 814 F.2d at 281).

The Arkansas Supreme Court noted two circumstances under which 42 U.S.C. 1983 liability: "(1) where the state has assumed a "special custodial or other relationship" with respect to the individual, or (2) where the state has affirmatively placed an individual in a position of danger from third parties." Id., 331 Ark. at 498. The Arkansas Supreme Court again discussed Nishiyama and found that a duty could be created where the government actor had provided a third party with the specific means and opportunity to commit a crime. Id. The Court also noted that although an individual may not be personally known to the government actor, a duty can arise if they are part of an identifiable group of potential victims. Id. The Court noted that a duty could arise where a dangerous environment was created by an established practice of state actors. Id. (citing *Wells v. Walker*, 852 F.2d 368 (8th Cir.1988) and *Cornelius v. Town of Highland Lake, Alabama*, 880 F.2d 348 (11th Cir.1989)).

Here we have a similar situation. When he made a stop based on reasonable suspicion, and determined that the individual was DWI, Bearden had was in a special custodial relationship with the individual who was DWI, because he had lawfully detained them. Simultaneously, according to the DWI statute and the testimony of Sheriff Lemon and the prosecutor Tommy Smith, a person is DWI where they are:

> influenced or affected by the ingestion of alcohol, a controlled substance, any intoxicant, or any combination thereof, to such a degree that the driver's reactions, motor skills, and judgment are substantially altered and **the driver, therefore, constitutes a clear and substantial danger of physical injury or death to himself and other motorists or pedestrians**.

Ark. Code Ann. 5-65-102(1) (emphasis added). Defendants have acknowledged that this presents a particular danger for a short period of time, to persons on County roads, as well as the driver themselves. Thus, we have a situation where Bearden, if he let a DWI drive away, would have subject the individual he had detained, and pedestrians and motorists on the road in that county to a clear and substantial danger, just like Nishiyama, a motorist was subjected to a danger that ultimately killed her.

In other words, if Bearden let persons who were DWI drive away, rather than arresting them, he would have been violating the constitutional rights of any person injured thereby, including the driver, motorists, and pedestrians.

## III.    Felony Tort

Defendants purport not to know what felony-tort is, and then argue they have immunity from suit in tort under Ark. Code Ann. 21-9-301, and that Plaintiff has not evidence of felony-tort anyway.  With respect to the first issue, Ark. Code Ann. 16-118-107 states that: "Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.".  Plaintiff is proceeding under Ark. Code Ann. 5-53-109, entitled "Threatening, intimidating witnesses," which states:

> (a) A person commits the offense of intimidating a witness if he threatens a witness or a person he believes may be called as a witness with the purpose of:
>
> > (1) Influencing the testimony of that person; or
> > (2) Inducing that person to avoid legal process summoning him to testify; or
> > (3) Inducing that person to absent himself from an official proceeding to which he has been legally summoned.
>
> (b) Intimidating a witness is a Class C felony

Id.  Thus, Plaintiff must established that: (1) he was threatened by Sheriff Lemon; (2) whose purpose was to influencing Bearden's testimony or causing him to not go to the trial; and (3) that an injury resulted.  Plaintiff has already demonstrated the threats and retaliation by Lemon, Lemon's intent, and that he was terminated in Section I above.  Thus, Plaintiff has established his case.

## IV.    The Grievance Committee has no effect on any of this

Defendant seems to be using the grievance committee as an all-purpose shield from liability, arguing estoppel/waiver, that the Sheriff is not the policy-maker on employment decisions at the Sheriff's office, and that the grievance committee, not the Sheriff's office made

the final decision on Bearden's termination.  These arguments all fail.  Thus, although testimony or other evidence at the grievance may be used, Defendant should not be allowed to present evidence, testimony, statements, or argument that the Plaintiff cannot establish intent, waived rights, or must abide by the finding of the grievance committee.

A county can be liable for the action of one of its employees or officials if that action reflects the official policy of the county.  A single action can represent the official policy of a county "provided that a deliberate choice to follow a course of action was made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  <u>Buzek v. County of Saunders</u>, 972 F.2d 992, 996 (8th Cir. 1992) (finding that a Nebraska Sheriff was the policy maker with respect to a termination decision).  Whether an official has final policy-making authority is a matter of state law.  <u>Williams v. Butler</u>, 863 F.2d 1398, 1401 (8th Cir. 1988).

Defendant is likely to argue that the County cannot be held liable because the Quorum Court Grievance Committee, not Sheriff Lemon, is the policy-maker on termination decisions.  This argument fails because Arkansas law clearly makes the Sheriff the policy-maker with respect to the hiring and firing of employees at the Sheriff's office.  Arkansas law states:

> (A) HIRING OF COUNTY EMPLOYEES, EXCEPT THOSE PERSONS EMPLOYED BY OTHER ELECTED OFFICIALS OF THE COUNTY. The county judge, as the chief executive officer of the county, shall be responsible for the employment of the necessary personnel or for the purchase of labor or services performed by individuals or firms employed by the county, or an agency thereof, for salaries, wages, or other forms of compensation.
> . . .
> (b) The jurisdiction to purchase the labor of an individual for salary or wages employed by other elected officials of the county shall be vested in each respective elected official.

Ark. Code Ann. 14-14-1102(b)(5)**.**

The Attorney General of Arkansas has issued an opinion indicating that this statute means that a quorum court cannot take control of hiring and firing decisions with regard to employees working under an elected official, in particular a Sheriff, as follows:

In my opinion, these constitutional and statutory provisions charge the quorum court with responsibility for shaping general policy on such uniformly applicable issues as leave and vacation time and normal working hours. This assignment of responsibility is consistent with the quorum court's role as the guardian of the public fisc. Nevertheless, as expressly stated in A.C.A. § 14-14-805(2), any such policies will not apply to elected officials. Moreover, it is clear that while the county judge has the power to hire county employees, other elected officials have exclusive power over hiring decisions in their own offices. A.C.A. § 14-14-1102(b)(5)(B)(ii)(b); Ark. Op. Att'y Gen. No. 97- 049 (attached). Elected officers are further charged with "[t]he day-to-day administrative responsibility" of running their offices, A.C.A. § 14-14- 805(2) - an obligation that in my estimation includes shaping employment policies necessary to insure the proper functioning of government.

*4 Indeed, to assign to the quorum court such executive policymaking decisions might well run afoul of Ark. Const. art. IV, §§ 1 and 2 and A.C.A. § 14-14-501, which dictate that the various branches of government operate independently of each other. See Karr v. Townsend, 606 F. Supp. 1121, 1132 (W.D. Ark. 1985) (declaring in dictum that it would violate the constitution for a quorum court to adopt a personnel policy that purported to restrict an executive officer's right to hire and fire his staff); cf. Walker v. Washington County, 263 Ark. 317, 564 S.W.2d 513 (1978) (holding that a quorum court ordinance that established uniform office hours for all constitutional offices did not violate the separation-of-powers doctrine); Ark. Op. Att'y Gen. No. 88-334 (same). As I opined in Ark. Op. Att'y Gen. No. 97- 310: "[T]he quorum court, as part of the legislative branch of government, cannot exercise an overruling influence over a county executive department official, or otherwise encroach upon or significantly interfere with executive powers." [FN1] See generally Chaffin v. Arkansas Game and Fish Commission, 296 Ark. 431, 757 S.W.2d 950 (1988); Oates v. Rogers, 201 Ark. 335, 144 S.W.2d 437 (1940); Ark. Op. Att'y Gen. No. 91-050. In my opinion, then, the personnel rules and regulations fashioned by elected officers to expedite their functions comprise "executive," as opposed to "general," employment policies, and only the elected officers themselves can dictate such policies.

Question 2: For example, may the elected official create and administer their [sic] own employee disciplinary measures? What if these are contrary to the quorum court's established personnel policies?

In my opinion, the answer to the first part of your question is "yes." Although one would hope these policies reasonably bear on the day-to-day functioning of the official's office, the only legal restraints on an executive officer's discretion in fashioning disciplinary measures are those discussed in detail in the attached Ark. Op. Att'y Gen. No. 97-049. See also Ark. Ops. Att'y Gen. No. 94-098 and 87-082. As previously noted, I believe the above described statutory scheme anticipates that the quorum court will dictate only such policies as apply generally to all county employees, as distinct from policies that bear uniquely on the functioning of a particular executive agency. I further agree with the district court in Karr that a quorum court cannot adopt even a uniformly applicable ordinance that would impinge on an elected officer's discretion in hiring and firing. **See Ark. Op. Att'y Gen. No. 87-312 (opining that the sheriff, not the quorum court, has exclusive authority to select deputies).** [emphasis added].

Question 3: May an elected official's employee handbook specifically state that their [sic] employees are at-will employees, even if the quorum court's personnel policy states that employees may only be dismissed for cause?

Although the Arkansas Supreme Court has never directly addressed this question, I believe the answer to your question is probably "yes." The general rule regarding at-will employment has been most recently stated in Ball v. Arkansas Department of Community Punishment, 340 Ark.424, 10 S.W.3d 873 (2000):

> In Arkansas, the general rule is that an employer or an employee may terminate an employment relationship at will. See Crain Indus., Inc. v. Cass, 305 Ark. 566, 810 S.W.2d 910 (1990); Gladden v. Arkansas Children's Hospital, 292 Ark. 130, 728 S.W.2d 501 (1987). There are two basic exceptions to the at-will doctrine: (1) where an employee relies upon a personnel manual that contains an express agreement against termination except for cause; and (2) where the employment agreement contains a provision that the employee will not be discharged except for cause, even if the agreement has an unspecified term. Gladden, 292 Ark. at 136.

In my opinion, the authorities recited in the preceding sections establish that, absent a contractual provision to the contrary, an elected officer has control over hiring and firing his staff, subject only to the condition that he cannot fire employees for exercising their rights of free political speech and association. [FN6] As reflected in amendment LV, § 3, this principle is of constitutional proportions. Accordingly, in Horton, the court affirmed a district court's holding that a quorum court was constitutionally barred from dictating to a county judge that his employees could be fired only for cause. 767 F.2d at 473. I believe, this same conclusion applies to any other elected officer.

The facts of this case, as well as other case law and policy favor holding that the Sheriff is the policy-maker. Defendant may argue that the statute merely speaks about decisions to purchase labor, and says nothing about hiring or firing.  However, the Sheriff and members of the quorum court were asked what it meant to have authority to "purchase the labor" of an individual.  All were agreed that it meant the authority make a decision to employ or to not employ a particular individual.  In other words, it means the ability to hire and fire.  It is notable that this requirement is enshrined in the Defendant's own policy manual.

In Dilday v. State, 300 Ark. 249, 778 S.W.2d 618 (1989), the Arkansas Supreme Court noted that "it is clear under the common law that by the nature of the two offices, a sheriff is liable for the actions of his appointed deputies and has control over their selection and

retention."  In <u>Thompson v. Bank of America</u>, 356 Ark. 576, 157 S.W.3d 174 (2004), the

Arkansas Supreme Court stated that:

> Although the General Assembly has the power to alter the common law, a
> legislative act will not be construed as overruling a principle of common law
> unless it is made plain by the act that such a change in the established law is
> intended.

<u>Id.</u>, 356 Ark. at 584, 157 S.W.3d at 179.  Thus, in order to find that the legislature intended to

overrule the common law, granting Sheriffs, and not quorum court's, final power over the hiring

and firing of deputies, the Court would have to find that the statute plainly intended to overturn

the established law.  This cannot be done given that the statute pretty plainly gives Sheriff's the

final power on hiring and firing decisions.

Indeed, this reasoning could also be applied to the quorum court's policy manual, to the

extent that Defendants argue that the quorum court set itself up as the policy-maker on all

employees not employed by the County Judge.  Defendants' policy manual indicates that all

employees are at will, that employees have no right to use the grievance procedure set up by

their ordinance, and recognizes the Sheriff's jurisdiction to hire and fire.  In <u>Faulkner v. Arkansas

Children's Hospital</u>, 69 S.W.3d 393, 406 (Ark. 2002) the Supreme Court of Arkansas held that

where a policy manual containing a grievance procedure repeatedly includes the phrase 'at will',

there was no employment contract or other obligation to give effect to the grievance procedure.

Given there was no clear effort to overrule the Sheriff's common-law authority to hire and fire

employees, the quorum court did not do so.  In any event, the quorum court does not have the

power to overrule the state legislature, regardless of what the quorum court intended to do when

it enacted the grievance policy.

Defendant may argue that dicta in <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-484,

106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986), indicates that the Sheriff is not a final policy-

maker, and that the quorum court is.  However, that was merely a hypothetical posed by the

Supreme Court in which it indicated that a Sheriff might be vested with discretion to hire and

fire, but not be a final policy-maker, unless, in the instance of that hypothetical, in which the county quorum court had final say on such matters, had delegated power to establish final policy to the Sheriff.  Since <u>Pembaur</u> was decided, the Eighth Circuit, in <u>Buzek</u>, held that the Sheriff's broad discretion to set policy as an elected official and the county attorney's admission that the Sheriff had exclusive power to hire and fire were sufficient to find the Sheriff was a policy-maker on employment issues.  <u>Id.</u>, 972 F.2d at 996.

In this case, as described above, the Arkansas statutes grant the exclusive power to hire and fire to the Sheriff.  In <u>Williams v. Butler</u>, 863 F.2d 1398 (8th Cir. 1988), the Eighth Circuit held the City of Little Rock liable for a municipal judge's termination based on statutory authority:

> Another predicate for the City's liability is that the Arkansas General Assembly, Ark.Stat.Ann. § 22-704.1(45) (Supp.1985), authorized municipal judges to employ persons to fill staff positions in that court. As noted in *Pembaur* at 483, *106 S.Ct. at 1300* "authority to make municipal policy may be granted directly by legislative enactment." This places municipal judges in the City of Little Rock as the official policymaker in hiring and firing staff. And, Butler in his official capacity as a municipal judge was exercising traditional municipal functions. It does appear both by legislative enactment and by a long established custom and practice that Butler was the official policymaker for the hiring and firing of his staff.

<u>Williams</u>, 863 F.2d at 1403.  In addition, although Defendant may argue that the statute only speaks about purchasing the labor of an employee, not terminating them, the Eighth Circuit also stated:

> This circuit, in applying an Arkansas statute in similar circumstances, has stated that when an official is vested with the right to hire, he or she also has "the concomitant duty to fire * * * employees." *Horton v. Taylor, 767 F.2d 471, 474 (8th Cir.1985)*. Therefore, under state statute (and not through a delegation of authority from another City entity with employment policy powers) we know that Judge Butler had final authority to hire and fire Ms. Williams. And, it is the exercise of this discharge power that is at issue in this case.

<u>Williams</u>, 863 F.2d at 1404 (J. Beam concurring).  Defendants have admitted that the quorum court cannot hire at the Sheriff's office, that only the Sheriff does that.

There are practical, policy-based rulings in favor of finding that the Sheriff is the policy maker on hiring and firing decisions.  Defendants have stated that they would not want to violate the separation of powers between county executive and legislative branches.  Defendants have also noted that even if the quorum court ordered reinstatement of an employee, the Sheriff could turn around and fire them the next day, or designate a deputy as Chief Toilet Cleaner, and essentially drive the person out of employment, regardless of what the quorum court wanted.  Finally, the Sheriff is also given final policy-making authority over law enforcement areas (Ark. Code Ann. 14-14-1301(a)(5), 14-15-501; and <u>Crowder v. Sinyard</u>, 884 F.2d 804, 828 (5th Cir. 1999)), and Defendants have noted that in order to make policy in that area, he needs to be able to control his employees through hiring and firing.

Assuming for purposes of argument alone, that the Quorum Court, not the Sheriff made the final decision, Sheriff Lemon and the County are still liable if Bearden was terminated in retaliation for engaging in a protected activity.  In <u>Darnell v. Ford</u>, 903 F.2d 556, 561-62 (8th Cir. 1990) the Defendant argued that a jury verdict in a First Amendment case should be overturned because he only made a recommendation, and that the Superintendent had made the final decision.  The Court upheld the verdict, partially because the appropriate objection had not been made to the jury instructions, but also noted:

> Furthermore, the record clearly reveals that "but for" Ford's recommendation, Darnell would not have been disciplined. *See Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) (causation can be established by direct personal participation in the deprivation or by participation setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injuries on third parties).

<u>Id.</u>, at 562.  In <u>Cox v. Dardanelle Pub. School Dist.</u>, 790 F.2d 668, 676 (8th Cir. 1986), the Eighth Circuit upheld the trial courts finding of retaliation despite the fact that the matter had been grieved to the School Board.  The only evidence cited for retaliatory intent was that related to the superintendent's intent:

> Dillard [the superintendent]admitted that Cox's individual grievance likely was a factor in subsequent decisions he made regarding her employment. At least

> three memoranda Dillard placed in Cox's personnel file, describing actions of Cox which he believed violated administrative policies or were improper, made reference to the grievance and suggested in each case that Cox's actions were not consistent with the criticisms she had levied against him in the grievance. *See* Joint Exhibit of Parties at 174, 175, 183. Furthermore, the district court took explicit notice of the fact that only the three teachers who filed individual grievances were subject that year to job-related sanctions. *Cox,* slip op. at 2.

Id., at 675.  Thus, even the addition of a neutral decision-maker, if the employee would not have been before them in the first place without the retaliation, the person committing the retaliation can still be liable.

The cat's paw cases establish that an employer can be liable for a termination where they acted as the tool of a person with discriminatory intent.  In Kramer v. Logan County Sch. Dist. No. R-1, 157 F.3d 620 (8th Cir. 1998), the Eighth Circuit found that although a grievance committee was involved, the plaintiff herself admitted the grievance committee was not biased, and had not raised issues of discrimination at the hearing, that the plaintiff had presented sufficient evidence of discriminatory intent on the part of two employees of the school district, who got a non-renewal decision rolling.  Id.  In Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051 (8th Cir. 1993), the Eighth Circuit recognized that it was appropriate to focus, not on the decision of the security department to terminate, but the decision of a supervisor to refer the plaintiff to that department, which led to the termination decision by the security department.  In finding there was a fact issue on illegal intent, the Court noted: (1) the supervisor's interest in the investigation; (2) his failure to similarly discipline and refer male officers to the security department; (3) violation of normal procedures by avoiding the normal chain of command; (4) lies about the plaintiff from the supervisor; and (5) failure to investigate other officers.  Id.  More recently, in Russell v. City of Kansas City, 414 F.3d 863 (8th Cir. 2005), a fact issue was found on discriminatory intent where a grievance committee was involved.

In this case, without Lemon's retaliation, Plaintiff would not have before the quorum court.  Plaintiff has established that Lemon alone made the termination decision.  Plaintiff has established that Lemon lied to the committee about why he was firing Bearden, that the

committee was improperly addressed in private by the county's lawyer, that there was not much in the way of deliberation, that substantial evidence was ignored. Thus, even if the grievance committee were the final decision-maker, the county and Lemon would be liable if they were his rubber stamp. See Pl.'s Aff. St. of Facts, at para. 64-67, 95-130.

With respect to issues of estoppel and waiver based on Heck v. Humphrey, 517 U.S. 477 (1994), Defendant said it best: "The facts in Heck are not similar to those in the instant case." Br. In Supp. Of Def'ts Mot. For Summ. J., at 10. Different situations – different results. In Heck, the Plaintiff was a convicted felon bringing a claim under 42 U.S.C. 1983, claiming that his criminal conviction in an actual court of law itself was a violation of his civil rights. The original conviction had never been invalidated, appealed, or otherwise voided. In other words, it was a valid conviction. Not surprisingly, the Supreme Court refused to countenance a collateral attack on that valid judgment.

Now, for the differences between this case and Heck. In Heck, the Plaintiff was a felon. Here, it is a law enforcement officer who was fired because he was trying to protect the public from drunken drivers. In Heck, the plaintiff/criminal defendant, while represented by an attorney, was convicted of a crime when the other party had the burden of proving beyond a reasonable doubt that he had been convicted of a crime. Here, the plaintiff, without an attorney present, had the burden of proof. In Heck, the plaintiff was convicted by an impartial judge or jury. Here, plaintiff's grievance was decided by a group of individuals whose obligation was to protect the county, but, in order to find for plaintiff, would have had to make a finding that would have established a lawsuit against the county (that Bearden had shown by the preponderance of the evidence that Lemon was motivated by an exercise of free speech rights). In the Heck, the criminal had the option of appealing, obtaining a pardon, or habeas corpus and did not. Here, there was no appeal from the grievance committee. In Heck, there would have been months to prepare for the trial. In this case, there were days. In Heck, the criminal was in front of a court lawfully empowered to hear his case. In this case, the quorum court absolutely did not

have the power to override the Sheriff or pass judgment on his termination decision.  In <u>Heck</u>, no doubt the attorney did not come back and talk to the judge or jury about the case during deliberations.  Here, the County Attorney came back with the grievance committee during deliberations.  Presumably, in <u>Heck</u>, no witnesses lied.  Here, Sheriff Lemon has actually claimed at least two untruths in his grievance testimony.  In written discovery he admitted that DWI issues were related to the termination, but said they were not at the hearing.  In addition, he now claims he falsely testified that he had a meeting with Bearden in September 2004.  The hearing in lasted approximately an hour and consideration of the grievance less than that. Different situations - different results.

Furthermore, estoppel is an equitable/fairness argument.  The doctrine of unclean hands is a defense to an equitable argument.  Estoppel involves situations where a party has reasonably relied on another to its detriment.  The Sheriff fired a deputy for following the law, exercising First Amendment rights, and protecting the public from drunken drivers.  The Sheriff has admitted he lied under oath to the grievance committee at least twice in the hearing.  The grievance committee is illegally constituted and could not provide Plaintiff any relief, because Sheriff Lemon would not abide by its decision since he would not take Bearden back unless legally required to do so.  Thus, there was no reliance or jeopardy for the Defendant in engaging in this grievance, and its hands are dirty.  There is no basis for an equitable argument here.

Respectfully submitted,

HARRILL & SUTTER, P.L.L.C.
Attorneys at Law
Post Office Box 26321
310 Natural Resources Drive
Little Rock, Arkansas 72221-6321
501/224-1050; Facsimile 501/223-9136
Attorneys for the Plaintiff


By: */s/ Lucien Gillham*
     Lucien Gillham, Ark. Bar #99199

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 3rd day of March 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel for the Defendants:

Mike Rainwater
Duncan & Rainwater, P.A.
POB 17250
Little Rock, AR 72222-1725

                                    /s/ Lucien Gillham
                                    Lucien Gillham

g:\doc\bearden\rsjbr.doc